IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SHAFEAH MORRISON, : | |
|     Plaintiff, : | CIVIL ACTION |
| : | |
| v. : | |
| : | |
| THOMAS JEFFERSON UNIVERSITY : | |
| HOSPITAL, : | No. 10-4365 |
|     Defendant. : | |

### MEMORANDUM

**Schiller, J.**                                                                 September 8, 2011

    Shafeah Morrison brings this action against Thomas Jefferson University Hospital, Inc. ("TJUH"). Morrison, an African American woman, alleges that her former employer, TJUH, fired her because of her race. She brings claims pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 1981, and the Pennsylvania Human Relations Act ("PHRA"). Currently before the Court are Defendant's motion for summary judgment, Defendant's motion to strike Plaintiff's amended disclosures, and Defendant's motion for reconsideration of the Court's August 17, 2011 Order. For the following reasons, Defendant's motion for summary judgment is granted, and Defendant's motions to strike Plaintiff's amended disclosures and for reconsideration of the Court's August 17, 2011 Order are denied as moot.

### I.   BACKGROUND

#### A.   Plaintiff's Employment at Thomas Jefferson University Hospital

    Morrison worked for TJUH as an "Emergency Department pool nurse." (Def.'s Statement of Undisputed Facts in Supp. of its Mot. for Summ. J. [Def.'s SOF], No. 2.) An Emergency Department pool nurse ("ED pool nurse") is a registered nurse who must work a minimum number

of hours on a part-time basis at TJUH, and who is evaluated and hired to work in the Emergency Department. (*Id.*) ED pool nurses fill vacancies in nursing schedules after staff nurses have selected or been assigned shifts. (*Id.*)

When a nurse finishes a shift, the outgoing nurse gives a hand-off report to the incoming nurse that typically includes information on each individual patient's history, diagnosis, treatment, and needs. (Pl. Opp'n to Def.'s Mot. for Summ. J. [Pl.'s Opp'n] Ex. 2 [Matthew Dep.] at 21:16–24.) Hand-off communication provides the receiving nurse an adequate opportunity to ask questions about the patients. (Pl.'s Opp'n Ex. 3 [Millinghausen Dep.] at 89:13–15.) TJUH's hand-off communications policy also notes the importance of "allowing opportunity for questions between the giver and receiver of patient information[,] . . .[l]imited interruptions to minimize the possibility that information would fail to be conveyed or would be forgotten[,]. . . [and the o]pportunity for receiver of hand-off information to review relevant patient historical data." (Pl.'s Opp'n Ex. 14 [TJUH Hand-Off Communications Policy] at 1.) Similarly, TJUH's "Target Quality" newsletter for February 2008 highlighted the hand-off communications policy, focusing on the need to provide up-to-date information, the opportunity to ask questions, and to limit interruptions. (Pl.'s Opp'n Ex. 15 [Target Quality Newsletter] at 1.) Morrison, however, disputes whether the newsletter was distributed to nurses and whether TJUH made efforts to provide training to nurses on the hand-off policy. (Pl.'s SOF No. 19.) Nonetheless, Morrison agreed that maintaining good hand-off communication policies was a very important function for patient safety, that every hospital should treat hand-off report policies with utmost importance, and that if a hospital did not enforce such policies, lives could be at risk. (Def.'s Mot. for Summ. J. Ex. 5 [Morrison Dep.] at 176:15–177:8.)

### B. Plaintiff's Conduct on March 28, 2008

On March 28, 2008, Morrison was working as a pool nurse in Area I–L on a shift scheduled to end at 3:30 p.m. (*Id.* at 142:15.) Morrison left her shift early and sought to give a hand-off report to Heather Matthew, who was working as a nurse in the Fast Track Area of the Emergency Room. (Pl.'s Opp'n Ex. 10 [Morrison Handwritten Statement]; Matthew Dep. at 9:14–10:1.) Matthew was working a split shift from 11:00 a.m. to 7:00 p.m., during which she would work the first half in the Fast Track Area and the second half in Area I–L. (Matthew Dep. at 9:12–19.) With a split shift, a nurse would generally wait for his or her replacement in the first assignment location to provide hand-off communication, and then he or she would go to the second assignment location to receive a hand-off report. (Millinghausen Dep. at 79:17–22.) This created a "three-way switch," in which two nurses needed relief and two nurses provided relief. (Matthew Dep. at 34:5–11.) With an 11 a.m. to 7 p.m. shift, the nurse would provide a hand-off report and receive one between 3 p.m. and 3:30 p.m. (*Id.* at 79:12–15.)

Viewing the evidence in the light most favorable to Plaintiff, Morrison's hand-off communications were inadequate. At 2:30 p.m., Morrison asked Matthew if she would receive the hand-off report early, to which Matthew responded that she was busy but that she would try. (Pl.'s Opp'n Ex. 13 [Matthew Email to Sheehan].) Sometime between 3:00 p.m. and 3:15 p.m., Morrison left Area I–L and went to the Fast Track Area to give a hand-off report to Matthew, although Matthew had not yet received her relief and was continuing her duties in the Fast Track Area. (Morrison Handwritten Statement.) Morrison told Matthew that she had not gotten a lunch break, felt a migraine headache coming, and had to pick up her children from school, and then asked to give Matthew a hand-off report. (*Id.*) Morrison knew that Matthew was covering the Fast Track Area,

3

which was on the opposite side of the department from Area I–L. Nonetheless, Morrison provided Matthew a brief hand-off report and told Matthew that she would leave her cell phone number at the desk if there were questions. (*Id.*; Matthew Email to Sheehan.) Matthew testified that she was distracted when Morrison provided her the hand-off report since, at that time, she was still overseeing her current patients. (Matthew Dep. at 19:5–22:24.)

After receiving the report, Matthew felt that the Area I–L patients were her responsibility, but being "physically on the other side of the department . . . they [we]re left uncared for." (*Id.* at 38:21–39:4.) Consequently, at 3:15 p.m., Matthew went to the Area I–L Day Shift Charge Nurse, Frank Rocco, to explain the situation and inform him that either she needed relief in the Fast Track Area or she needed coverage in Area I–L. (*Id.* at 42:22–43:3.) Rocco asked Stacey McKnight, the Evening Shift Charge Nurse, to look into the situation, and McKnight paged Morrison. (Pl.'s Opp'n Ex. 1 [McKnight Dep. at 37:10–40:7].) Morrison heard, but failed to respond to the page and left the hospital. (Pl.'s Opp'n Ex. 11 [Morrison Letter] at 3.)

        **C.**    **Investigation of Plaintiff's March 28, 2008 Conduct**

On March 31, 2008, Adrienne Sheehan, Nurse Manager for the Emergency Department, asked Morrison to come in before her shift, but Morrison stated that she was unavailable. (Morrison Letter at 1.) Sheehan then asked Morrison to come to her office when she arrived for her shift. (*Id.*) After arriving, Morrison met with Sheehan and Denise Shapiro, Nurse Manager for other nursing units, about Morrison's March 28, 2008 hand-off. (*Id.*; Millinghausen Dep. at 10:9–13.) Based on their conversation, Sheehan suspended Morrison pending further investigation. (Pl.'s Opp'n Ex. 9 [Millinghausen Conference/Anecdotal Record] at 1.)

After her suspension, Morrison drafted a letter recounting her version of the events leading

to her suspension and raising concerns about her treatment by Shapiro over numerous years. Morrison raised concerns about TJUH as a "clique-driven environment," with few African American nurses in the Emergency Department and Morrison's perception that she was "not wanted there." (Morrison Letter.) After TJUH further investigated, Morrison met with Sharon Millinghausen, Vice President Medicine, Cardiac Critical Care and Specialty Services and Sheehan. Morrison's mother-in-law attended the meeting to serve as Morrison's witness. Morrison explained her version of events, and she raised concerns about Shapiro, although she did not state that she believed she was being treated differently because of her race. (Millinghausen Dep. at 43:1–46:16.) Millinghausen testified that following the meeting, she believed that Morrison "did not . . . [understand] that she abandoned her patients and that . . . she did not respond to an overhead page that would have potentially clarified information . . . important to ensuring the patients get safe appropriate care." (*Id.* at 50:17–22.) Millinghausen emphasized that she had serious concerns that Morrison did not understand the gravity of the situation and that she might repeat the behavior. (*Id.* at 50:13–54:17.) Millinghaused looked into the allegations in Morrison's letter and consulted with Employee Relations. (*Id.* at 66:1–77:13.) After further investigation by Millinghausen, TJUH fired Morrison. (Pl.'s Opp'n Ex. 7 [Termination Letter] at 1.)

## II. STANDARD OF REVIEW

Summary judgment is appropriate when the admissible evidence fails to demonstrate a dispute of material fact and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 411 U.S. 242, 247–48 (1986). When the moving party does not bear the burden of persuasion at trial, it may meet its burden on summary judgment by showing

that the nonmoving party's evidence is insufficient to carry its burden of persuasion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Thereafter, the nonmoving party demonstrates a genuine issue of material fact if sufficient evidence is provided to allow a reasonable finder of fact to find for the nonmoving party at trial. *Anderson*, 477 U.S. at 248. In reviewing the record, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994). A court may not make credibility determinations or weigh the evidence in making its determination. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

**III.   DISCUSSION**

Plaintiff alleges that she was discriminated against on the basis of race in violation of Title VII, Section 1981, and the PHRA. "Claims under the PHRA are interpreted coextensively with Title VII claims." *Atkinson v. LaFayette Coll.*, 460 F.3d 447, 454 n.6 (3d Cir. 2006). Likewise, the standards are identical under Title VII and Section 1981. *See, e.g.*, *Brown v. J. Kaz, Inc.* 581 F.3d 175, 181–82 (3d Cir. 2009). Thus, this Court will analyze Plaintiff's claims under a Title VII framework, and the conclusions will apply equally to her PHRA and Section 1981 claims. *See Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 317 n.3 (3d Cir. 2000).

Plaintiff's claim of race discrimination is governed by the burden-shifting test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 270–71 (3d Cir. 2010). Plaintiff must first establish a *prima facie* case of discrimination by establishing that: (1) she is a member of a protected class; (2) she was qualified

6

for the position she sought to retain; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination. *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008). If the plaintiff establishes a *prima facie* case, the burden of production shifts to the defendant to assert a non-discriminatory reason for the adverse employment decision. *Anderson*, 621 F.3d at 271. The defendant need not prove that the specified non-discriminatory reason given is the actual motivation for its action. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). If the defendant sets forth such a reason, the burden of production shifts back to the plaintiff, who must then show by a preponderance of the evidence that the employer's reason is merely a pretext for discrimination. *Anderson*, 621 F.3d at 271.

A plaintiff demonstrates pretext by "present[ing] sufficient evidence to raise a genuine issue of fact as to whether the defendant's proffered reasons were not its true reasons for the challenged employment action." *Stewart v. Rutgers*, 120 F.3d 426, 433 (3d Cir. 1997); *see also Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 413 (3d Cir. 1999). A plaintiff survives summary judgment by proffering "admissible evidence[] that the employer's articulated reason was not merely wrong, but that it was so plainly wrong that it cannot have been the employer's real reason," or by "pointing to evidence in the record which allows the fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Jones*, 198 F.3d at 413 (internal quotations omitted).

      **A.**     **Plaintiff Fails to Demonstrate a Prima Facie Case of Race Discrimination**

Plaintiff has met the first three prongs of her *prima facie* case. Since Plaintiff is an African American woman, she is a member of a protected class. She was a qualified ED pool nurse based on her education and experience. Morrison suffered an adverse employment action when she was

discharged from that position on April 11, 2008. However, Morrison has produced no evidence from which a reasonable fact finder could infer that TJUH's termination of Morrison resulted from discrimination. The Court will not infer discrimination simply because a member of a protected class suffered an adverse employment decision. Further, a plaintiff's claim cannot survive summary judgment by merely showing that the employer's decision was wrong or mistaken. *Fuentes*, 32 F.3d at 765. Rather, Morrison must present evidence—not merely unsupported assertions—to establish a *prima facie* case.

Plaintiff believes that she was discriminated against because two similarly situated white nurses, Matthew and McKnight, were not disciplined for their conduct related to her actions on March 28, 2008. "The similarly situated analysis must take into account the particular circumstances of the alleged discriminatory act." *Seiple v. Friendly Ice Cream Corp.,* Civ. A. No. 08-4201, 2009 WL 2776609, at *5 (E.D. Pa. Aug. 31, 2009). Here, the alleged conduct of the other nurses is not remotely on par with Plaintiff's alleged conduct, and Plaintiff fails to show the employees are "similarly situated." *See O'Neill v. Sears, Roebuck and Co*., 108 F. Supp. 2d 433, 439 (E.D. Pa. 2000) ("comparators should have dealt with the same supervisor, have been subject to the same standards, and have engaged in the same conduct"). Matthew received Plaintiff's report and quickly contacted the charge nurse to ensure adequate nurse coverage, whereas Plaintiff left her nursing assignment early and provided a hand-off report to a nurse who was clearly not prepared to immediately take over the assignment. McKnight had not told Morrison that she was not the supervising charge nurse at the time that Morrison told her that she wanted to leave early. McKnight also did not pass along Morrison's desire to leave early to the on-duty charge nurse. Morrison, on the other hand, left her shift early without authorization. Matthew and McKnight are thus not

similarly situated to Morrison.

Plaintiff argues that her exemplary performance record should have been considered before she was fired. TJUH does not dispute Morrison's previous performance record, but rather emphasizes that her alleged conduct on March 28, 2008, along with her subsequent statements about that conduct, subjected her to termination anyway.

Plaintiff also argues that Defendant's refusal to consider alternatives to termination raises an inference of discrimination. Plaintiff points to a white nurse, Michael Haviland, to demonstrate that retraining has been used as a disciplinary tool for a white nurse. However, Haviland's disciplinary action was in response to his use of profanity in front of patients, and his retraining included anger management classes. (Pl.'s Opp'n Ex. 6 [Sheehan Dep.] at 17:23–20:2.) Again, Plaintiff fails to demonstrate that she and Haviland are similarly situated given their transgressions, both in terms of seriousness of conduct and impact on patient care.

Plaintiff further argues that Shapiro influenced Millinghausen's decision to terminate her, arguing that Shapiro both disliked Plaintiff and harbored racial animus toward her. There is substantial evidence in the record demonstrating Millinghausen's primary role both in the investigation of Plaintiff's conduct, as well as in the decision to terminate Plaintiff. Further, there is no evidence that Shapiro influenced Millinghausen based on Plaintiff's race. Plaintiff points to her own testimony that "other Black nurses told her that Shapiro was biased against them." This is an unsupported assertion, and is thus insufficient evidence to withstand summary judgment. *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2004).

**B.    Plaintiff Fails to Establish Pretext**

Even if Plaintiff could make out a *prima facie* case of racial discrimination, Defendant would

still be entitled to summary judgment. TJUH proffers a legitimate, non-discriminatory reason for the decision to terminate Morrison: she abandoned her patients when she left her nursing assignment early on March 28, 2008, without providing adequate hand-off communications. (Termination Letter at 1.) She also failed to provide adequate assurance that such conduct would not occur again in the future. (*Id.*) Therefore, under the *McDonnell Douglas* framework, Plaintiff must proffer sufficient evidence such that the trier of fact could reasonably disbelieve TJUH's proffered non-discriminatory reasons or believe that invidious discrimination more likely caused the action. *See Simpson v. Kay Jewelers*, 142 F.3d 639, 644 (3d Cir. 1998). A plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Fuentes*, 32 F.3d at 765.

Morrison has failed to come forward with evidence discrediting TJUH's non-discriminatory rationale for the termination. As noted above, the majority of the conduct Plaintiff points to does not implicate race nor refute Defendant's contention that the decision to terminate Morrison was based on her conduct in leaving her assignment while providing inadequate hand-off communications. Plaintiff contends that three additional factors demonstrate pretext; however, all of these factors also fail to do so. First, Plaintiff argues that the shift in the tenor of Millinghausen's choice of language from the April 11, 2008 termination letter to her July 15, 2011 deposition is inconsistent and intended to ratchet up the seriousness of Plaintiff's conduct. This argument lacks merit. The terminology used and characterization of Morrison's conduct consistently shows the seriousness of her offense. In the termination letter, Millinghausen stated that Morrison "left [her] patient

assignment without authorization from departmental management and without providing the appropriate and complete patient care report of the patients in [her] care. [Her] actions jeopardized patient care continuity and safety." (Termination Letter at 1.) This conveys as serious of a charge as "patient abandonment." Second, Plaintiff argues that Defendant's failures in following its employee disciplinary procedures raises an inference of discrimination. Specifically, Plaintiff states that Defendant failed to include human resources in the termination decision. Plaintiff is incorrect; Millinghausen testified that she consulted Employee Relations and would not have made a decision without their approval. (Millinghausen Dep. at 58:14–60:20.) Finally, Plaintiff argues that Defendant's failure to investigate her claims raised in the Morrison Letter demonstrates pretext. Once again, Plaintiff's conclusory statement is contradicted by evidence in the record. Millinghausen did, in fact, investigate Morrison's complaints. (Millinghausen Dep. at 66:1–77:13.),

Morrison has not presented sufficient evidence such that a reasonable fact finder could disbelieve Defendant's proffered non-discriminatory reason for its decision. Without evidence of pretext, TJUH is entitled to summary judgment on all of Morrison's claims.

**IV. CONCLUSION**

Plaintiff fails to establish a *prima facie* case of race discrimination. Furthermore, Plaintiff failed to satisfactorily discredit Defendant's legitimate non-discriminatory justification for termination. For the foregoing reasons, Defendant's motion for Summary Judgment is granted. An Order consistent with this Memorandum will be docketed separately.